In re DOWNING et al.

(Circuit Court of Appeals, Second Circuit.   June 15, 1893.)

1. CUSTOMS DUTIES—COMMERCIAL DESIGNATION—VERMILION RED.
   The tariff act of 1890 imposes a specific duty of 12 cents per pound on "vermilion red, and colors containing quicksilver."   Genuine vermilion red contains quicksilver, and there is an imitation of this color which contains none.   It appeared that at the date of the act both the genuine and the spurious were known and designated commercially as "vermilion red."   *Held*, that the imitation was subject to the same duty as the genuine, and was not dutiable under the provision of the color

schedule imposing a duty of 25 per cent. ad valorem on "other paints and colors not specially provided for."

2. SAME—CONSTRUCTION—COMMITTEE REPORTS.

The first-quoted clause of the act so clearly covers the article in question, the imitation vermilion red, that statements contained in the report of a senate committee on the act cannot be considered to show an inferential intent to place it under the second clause.

Appeal from the Circuit Court of the United States for the Southern District of New York.

At Law. Appeal in behalf of the United States to the United States circuit court of appeals for the second circuit from a judgment of the United States circuit court for the southern district of New York affirming a decision of the board of United States general appraisers. Judgment reversed.

The firm of R. F. Downing, on January 21, 1891, imported, by the Lydian Monarch, from England into the United States, at the port of New York, certain merchandise, consisting of a dry paint or color composed of 72.39 per cent. orange mineral or red lead, 23.71 per cent. whiting, and 3.90 per cent. eosine, and invoiced as "carmine red." This merchandise having been returned by the local appraiser as vermilion red, as it possessed the tint known commercially as "vermilion red," was classified for duty at the rate of 12 cents a pound, as vermilion red, under the provision for "vermilion red, and colors containing quicksilver, dry or ground, in oil or water, twelve cents per pound," contained in paragraph 57 of that part of Schedule A entitled "Paints, Colors and Varnishes," of the tariff act of October 1, 1890, (26 Stat. 569,) and duty at that rate was exacted thereon by the collector of customs at that port.

Against this classification and this exaction the importers duly protested, claiming that this merchandise was dutiable "under either one of the following named paragraphs: Paragraph 61, Schedule A, twenty-five per centum ad valorem; paragraph 65, Schedule A, at three and one-half cents per pound; paragraph 66, Schedule A, at three cents per pound,—all in the act of October 1, 1890," and in that part of said schedule entitled as aforesaid. Paragraph 61 reads as follows: "All other paints and colors, whether dry or mixed, or ground in water or oil, including lakes, crayons, smalts and frostings, not specially provided for in this act, and artists' colors of all kinds in tubes or otherwise, twenty-five per centum ad valorem; all paints and colors, mixed or ground with water or solutions other than oil, and commercially known as artists water color paints, thirty per centum ad valorem." Paragraph 65 reads as follows: "Orange mineral, three and one-half cents per pound." Paragraph 66 reads as follows: "Red lead, three cents per pound." Upon the receipt of this protest the aforesaid collector, pursuant to section 14 of the customs administrative act of June 10, 1890, (26 Stat. 137,) transmitted the invoice of this merchandise, and all the papers and exhibits connected therewith, to a board of three United States general appraisers on duty at the port of New York, to examine and decide the case thus submitted. The board of United States general appraisers, having taken the evidence of witnesses produced before them, made the following decision:

"The merchandise is a color composed of orange mineral, whiting and eosine, and is invoiced as 'carmine red.' As it possesses the tint known commercially as 'vermilion red,' it was returned by the appraiser as vermilion red, and duty was accordingly assessed at 12 cents per pound, under paragraph 57, Tariff Ind. (New.) The appellants claim that the article is dutiable either under paragraph 61, Id., at 25 per cent., or under paragraph 65, as orange mineral, at 3½ cents a pound, or under paragraph 66, as red lead, at 3 cents a pound.

"The determination of the question involved in this case being of importance to many and great interests, the board gave a hearing, which was attended by importers and domestic manufacturers, and the subject has since received a careful and thorough consideration. From the testimony,

we find that the terms 'vermilion' and 'vermilion red' are applied indiscriminately, in the trade, to genuine vermilion, which contains quicksilver, and to its imitations or substitutes, which do not. In orders for genuine vermilion the article is usually designated as 'English vermilion,' while imitations and substitutes are known by fancy names, such as 'Eureka vermilion,' 'Champion vermilion,' etc. We further find that in the trade 'vermilion red' is not applied to articles composed of any particular material, but is held to embrace any color that has the bright red tint once peculiar to vermilion, or sulphide of mercury.

"The tariff provides, in paragraph 57, for 'Vermilion red, and colors containing quicksilver.' The paragraph in the bill, as it came from the house, reads, 'Vermilion red, or colors containing quicksilver.' The 'or' was struck out by the senate finance committee, and the conjunction 'and' inserted. The law contains the provision thus modified. Had the paragraph remained as it passed the house, it would have been clear to all that the duty of 12 cents a pound was applicable only to vermilion containing quicksilver; but it is now claimed that the change of conjunctions removed the limitation, and made the duty applicable to any article known as vermilion red. This does not, however, appear to have been the intention of congress, judging from the official record. The report of the senate finance committee, which was adopted, so far as this modification is concerned, contains the clause as modified, and says, in explanation of the change of rates from the old tariff to the new, 'This is a change from ad valorem to an equivalent specific rate.' The rate fixed is 12 cents a pound, the highest specific rate named in the schedule. The equivalent ad valorem rate must therefore have been levied upon a costly material. Taking the context, 'Vermilion red, and colors containing quicksilver,' and bearing in mind that quicksilver vermilion had been paying duty, under the general provision for colors, at 25 per cent. ad valorem, and that the equivalent specific rate would be about 12 cents a pound, the conclusion seems irresistible that the intention of congress was to apply the new rate to genuine vermilion or sulphide of mercury, and not a variety of substances tinted red, but varying in value from 1½ cents a pound up. The term 'color,' as an equivalent for 'paint,' is defined by Webster as 'that which is used to give color.' The duties in the color schedule attach, not to colors as tints, but to materials used to give colors. In every paragraph of the schedule the colors enumerated either represent particular substances, or include specified materials, for instance: Paragraph 50, blues containing ferrocyanide of iron; 52, black made from bone, ivory, or vegetable; 53, chrome yellow, in which lead and bichromate of potash or soda are component parts; 58, wash blue, containing ultramarine. It is repugnant to reason to suppose that congress made paragraph 57 the one exception to this practice, and levied the highest specific duty in the schedule upon a tint or shade of color, regardless of the material used to give color.

"The only vermilion described in Webster, the British Encyclopedia, and other standard authorities consulted, is a combination of quicksilver and sulphur. In the opinion of the board it is upon this vermilion, costing about 50 cents a pound in foreign markets, that congress intended to levy, and did levy, a duty of 12 cents a pound. As the merchandise in question contains no quicksilver, and as it is a color not specially provided for, the claim of the importer that it is dutiable at 25 per cent. is sustained."

The collector, being dissatisfied with this decision of the board of United States general appraisers, applied to the circuit court of the United States for the southern district of New York for a review of the questions of law and fact involved therein, under the provisions of section 15 of the aforesaid customs administrative act. Pursuant to an order made by the said circuit court upon this application, the said board made its return. Thereafter, further evidence was taken in the said circuit court in behalf of the collector and the importers, by which it appeared, among other things, in addition to the facts contained in the statement of facts hereinbefore made, and in the findings of facts set out in the above-mentioned decision of the board of United States general appraisers, that the importations in suit were paints or colors made in imitation of the genuine vermilion red, and while known by the specific name of "carmine red," or by other specific names, belonged to the class

of paints or colors which at the date of the passage of the aforesaid tariff act was commercially known as "vermilion" or "vermilion red." Subsequently said circuit court, in view of the aforesaid statement of the senate finance committee, and under its interpretation of the decision in the case of Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. Rep. 511, rendered judgment affirming the decision of the board of United States general appraisers.

Edward Mitchell, U. S. Atty., and Thomas Greenwood, Asst. U. S. Atty.

Hess, Townsend & McClelland, (Wm. J. Townsend, of counsel,) for appellees.

Before WALLACE and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. The question in this case is whether the importations in controversy were dutiable under that provision of the tariff act of October 1, 1890, found in the color schedule, which subjects to the rate of 12 cents per pound "vermilion red, and colors containing quicksilver, dry or ground, in oil or water." The board of general appraisers and the circuit court were of the opinion that the importations were dutiable under another provision of the act, as "other paints and colors, not specially provided for in this act," at 25 per centum ad valorem. The importations were paints or colors made in imitation of the genuine vermilion red, and belonged to the class which at the date of the passage of the tariff act was commercially known as "vermilion" or "vermilion red," the two names being indiscriminately used. The genuine vermilion red contains quicksilver, and colors like the importation do not; but the trade denomination for the genuine and the imitations, alike, is vermilion red, and by trade usage the term embraces any color having the bright red tint which once was peculiar to the sulphide of mercury.

Applying the familiar rule that a commercial designation of an article among traders and importers, where such designation is clearly established, fixes its character for the purpose of the tariff laws, if the provision is read in its natural and ordinary sense. it subjects to the duty specified all colors which at the date of the act were commercially known as "vermilion red," whether they do or do not contain quicksilver. There is nothing in the other provisions of the color schedule to qualify the interpretation of the provision in question, or even suggest the conjecture that it does not mean exactly what it says. According to its plain import, it imposes a specified duty upon every color known as "vermilion red," and if there is any color not known by that name, but containing quicksilver, upon every such color, also.

It appears that while the tariff act was under consideration by congress the provision in question, which originally read "vermilion red, or colors containing quicksilver," was amended so that the word "or" was stricken out, and the word "and" was inserted. Had not this change been made, there might be room for argument that the two descriptive terms were intended as the equivalent, one for the other; but the amendment serves to remove any doubt which might have been suggested by the original phraseol-

ogy of the bill. The board of general appraisers and the circuit court were led to sustain the contention of the importers, that it was the intention of congress to levy the duty only upon vermilion red containing quicksilver, because of a statement which appears in a report of a committee of the senate explaining the change of rates from the old tariff to the new. The report contains this statement with respect to the color schedule: "This is a change from an ad valorem to an equivalent specific rate." Under the former tariff the rate upon vermilion had been 25 per cent. ad valorem, which is substantially the equivalent of the specific duty of 12 cents a pound. This statement, by some of those who participated in framing the act, cannot, in our judgment, be permitted to nullify the language deliberately employed by the whole body of legislators. When the language of a statute is plain and unequivocal, it is not permissible to search for another meaning, which may have existed in the minds of individual legislators, and, finding that meaning, to substitute it for the meaning expressed. But the value of the statement in the report is completely neutralized by the proceedings of the senate when the act was on its passage, as appears by the Congressional Record. One of the senators moved to amend the bill by substituting in place of the specific duty the ad valorem duty of the former tariff, and in behalf of that motion stated to the senate that the effect of the specific duty would be to impose upon some of the lower grades of vermilion red a duty equal to 75 per cent. ad valorem. Notwithstanding this explanation the senate refused to agree to the amendment. If congress had not intended to place the duty on vermilion red of all kinds, that purpose could have been readily expressed; and we cannot doubt it would have been expressed by placing it upon "vermilion red containing quicksilver," instead of upon "vermilion red, and all colors containing quicksilver."

The circuit court, in affirming the decision, of the board of general appraisers, referred to the case of Church of Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. Rep. 511, which was apparently pressed upon its attention as an authority for permitting courts to discard the language of a statute, and interpret its purpose by the supposed intention of the lawmakers, gathered from general considerations of justice or expediency. That adjudication, according to our experience, has been invariably cited where the effort has been to induce this court to legislate, and substitute its own notions of what the law should be for the plainly expressed will of the legislative body. We do not understand, however, that it sanctions any new rules of statutory interpretation.

The judgment of the circuit court is reversed.